**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| CDI Energy Services, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING EX PARTE** |
| | ) | **TEMPORARY RESTRAINING ORDER** |
| vs. | ) | |
| | ) | |
| West River Pumps, Inc., John Martinson, | ) | Case No. 1:07-cv-085 |
| Dale Roller, and Kent Heinle, | ) | |
| | ) | |
| Defendants. | ) | |

Before the Court is the plaintiff, CDI Energy Services, Inc.'s (CDI), "Motion for Temporary Restraining Order and Preliminary Injunction" filed on November 16, 2007. CDI seeks a temporary restraining order and a preliminary injunction enjoining the defendants, West River Pumps, Inc., John Martinson, Dale Roller, and Kent Heinle (collectively "the Defendants"), from using, disclosing, or transmitting CDI's confidential trade secrets for any purpose.

**I.      BACKGROUND**

CDI began operations in 1999 as CDI Axelson after it acquired the sales and marketing arm of Axelson, Inc., a provider of production equipment to the oil and gas industry. In March 2007, Upstream Energy Services, Inc., purchased CDI's assets, liabilities, and goodwill. CDI has 24 service offices in the United States, including one in Dickinson, North Dakota. CDI sells and services sucker rods, sucker rod pumps, general oilfield supplies, tubing anchors, well service products, and surface safety equipment used for the recovery of oil and gas with artificial lift. The artificial lift segment of the oil and gas industry is a specialized industry that is based on the ability to understand each customer's need in the area of sales and service of pumps and equipment related

1

to the oil and gas industry. Because of the specific and individualized nature of the business, customer relationships and information related to those relationships are critical to CDI's success. CDI closely guards this information from its competitors. See Affidavit of Danny Matherne, Docket No. 11-2, p. 2.

The three individual defendants, John Martinson, Dale Roller, and Kent Heinle, were the only employees at CDI's Dickinson office. Martinson was the district manager, Roller was the sales and service representative, and Heinle was the service technician. Martinson and Roller were employees at CDI when its name changed from CDI Axelson. Heinle began working at CDI in 2003. The defendants were tasked with overseeing the Dickinson office's operations and protecting CDI's interests and confidential proprietary information. On October 16, 2007, Martinson, Roller, and Heinle resigned from CDI.

Beginning on or before October 16, 2007, Martinson, Roller, and Heinle became joint owners and employees of West River Pumps, Inc. (West River), a company formed to compete with CDI. Martinson had incorporated West River as a North Dakota corporation in 2005. See Affidavit of Danny Matherne, Docket No. 11-2, p. 1. West River's trade name was registered in 2007. Before October 16, 2007, West River did not have a presence in the Dickinson oil and gas well sales and service market. At some point before October 16, 2007, Martinson, Roller, and Heinle removed from CDI's office some customers' spare pumps that were waiting for service. See Affidavit of Danny Matherne, Docket No. 11-2, p. 5. CDI contends that West River used CDI's confidential business information to determine how to best serve those customers. Beginning on October 16, 2007, CDI's Dickinson office stopped receiving customer calls for services. Before that date, CDI had always received numerous customer calls each day. See Affidavit of Danny Matherne, Docket

No. 11-2, p. 7.  For this reason, CDI contends that before Martinson, Roller, and Heinle left CDI, they solicited CDI customers to switch their business to West River.  Beginning on October 16, 2007, virtually all of CDI's customers had decided to transfer their business to West River.  CDI claims that it was informed that its customers were notified of the defendants' planned departure from CDI several days before October 16, 2007.

CDI contends that Martinson, Roller, and Heinle resigned from CDI at a time when many of CDI's customers were increasing their oil and gas well sales and service needs.  See Affidavit of Danny Matherne, Docket No. 11-2, p. 6.  CDI contends that the timing of their resignations gave West River a distinct advantage in convincing CDI's customers to switch to West River; the customers knew that CDI lost all of its Dickinson office employees and if they wanted their sales and service needs met they needed to deal with West River.

During their employment with CDI, Martinson, Roller, and Heinle received ongoing management training, access to confidential information, and a marketing network.  See Affidavit of Danny Matherne, Docket No. 11-2, p. 3.  Martinson, Roller, and Heinle were provided with information on all of CDI's customers, specifically, intimate details of CDI's customers' oil and gas well programs and strategies, and pump repair history.  The defendants also obtained substantial knowledge of CDI's internal workings, including its business strategies, costs, pricing methods, marketing approaches, and CDI's customized solutions to its customers' needs.  See Affidavit of Danny Matherne, Docket No. 11-2, p. 3.  While employed by CDI, they had access to CDI's technical quality manuals, safety manuals, policy manuals, and procedure manuals.  See Affidavit of Danny Matherne, Docket No. 11-2, p. 5.

CDI has policies that prohibit employees from disclosing CDI's confidential information and trade secrets, and from engaging in any activity that conflicts with CDI's interests. See Affidavit of Danny Matherne, Docket No. 11-2, pp. 5-6. CDI contends that Martinson, Roller, and Heinle have used and are using confidential information they obtained at CDI for their benefit at West River. CDI contends that the defendants are using this confidential information are now unfairly competing with CDI and have caused CDI to lose its customers, its goodwill, its present and future business in Dickinson, and have depleted CDI's Dickinson sales and service team that generated more than one million dollars in annual revenue. In addition to the many customers that have already transferred their business to West River, CDI's remaining customers have been solicited by West River and are considering switching to West River.

## II.   LEGAL DISCUSSION

Pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, in determining whether a temporary restraining order should be issued, the Court must look to the specific facts shown by affidavit(s) to determine whether immediate and irreparable injury, loss, or damage will result to the applicant. In determining whether preliminary injunctive relief should issue, the Court is required to consider the factors set forth in Dataphase Systems, Inc., v. C.L. Sys. Inc., 640 F.2d 109, 114 (8th Cir. 1981) (*en banc*). The Eighth Circuit summarized those factors as follows:

> When considering a motion for a preliminary injunction, a district court weighs the movant's probability of success on the merits, the threat of irreparable harm to the movant absent the injunction, the balance between harm and the injury that the injunction's issuance would inflict on other interested parties, and the public interest. Dataphase Systems, Inc. v. C.L. Sys. Inc., 640 F.2d 109, 114 (8th Cir. 1981) (*en banc*). We reverse the issuance of a preliminary injunction only if the issuance "is the product of an abuse of discretion or misplaced reliance on an erroneous legal

4

premise." City of Timberlake v. Cheyenne River Sioux Tribe, 10 F.3d 554, 556 (8th Cir. 1993) *cert. denied* 512 U.S. 1236, 114 S.Ct. 2741, 129 L.Ed. 2d 861 (1994).

Pottgen v. Missouri State High School Activities Ass'n, 40 F.3d 926, 929 (8th Cir. 1994); Pruco Securities Corp. v. Montgomery, 264 F. Supp. 2d 862, 866 (D.N.D. 2003).

The burden of establishing the necessity of a temporary restraining order or a preliminary injunction is on the movant. Baker v. Electric Co-op, Inc. v. Chaske, 28 F.3d 1466, 1472 (8th Cir. 1994); Modern Computer Sys., Inc. v. Modern Banking Sys., Inc., 871 F.2d 734, 737 (8th Cir. 1989) (*en banc*). "No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards granting the injunction." Baker, 28 F.3d at 1472 (quoting Calvin Klein Cosmetics Corp. v. Lenox Labs, Inc., 815 F.2d 500, 503 (8th Cir. 1987)).

### A.    PROBABILITY OF SUCCESS ON THE MERITS

CDI contends that it is likely to succeed on its claim for misappropriation of trade secrets. CDI's claim is based on the North Dakota Uniform Trade Secrets Act. Under the Uniform Trade Secrets Act (UTSA), (1) "actual or threatened misappropriation may be enjoined;" (2) "a complainant is entitled to recover damages for misappropriation;" and (3) attorneys' fees may be awarded. See N.D.C.C. §§ 47-25.1-02(1); 47-25.1-03; 47-25.1-04. In order to prove a claim, CDI must establish that the customer information is a "trade secret" and that the information has been misappropriated.

### 1. THE CUSTOMER INFORMATION CONSTITUTES A TRADE SECRET

The UTSA defines "trade secret" as follows:

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
> (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
> (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

See N.D.C.C. § 47-25.1-01(4).

CDI's customer information, pricing information, and manuals, derived through extensive efforts and expense by CDI, arguably constitute trade secrets that are entitled to protection. CDI contends that it owned trade secret information pertaining to product and service costs and pricing information, customer-specific product purchases and service and repair logs, quantities of products purchased and services required, customer-specific contact information, and technical operating manuals.

The Eighth Circuit has recognized that customer information can constitute a protectable trade secret. See Synergetics, Inc. v. Hurst, 477 F.3d 949, 957 (8th Cir. 2007) (applying Missouri UTSA and stating that jury found product pricing information, customer-specific product purchases, quantities of products its customers purchased, and prioritization of its products to constitute trade secret information); Conseco Fin. Serv. v. N. Am. Mort., 381 F.3d 811, 819 (8th Cir. 2004) (applying the UTSA under Missouri law); cf Western Forms, Inc. v. Pickell, 308 F.3d 930, 934 (8th Cir. 2002) (finding that customer list and pricing information are not secret information because they

were readily available). At this preliminary stage of the proceedings, the Court finds that CDI's customer information is likely to constitute "information" within the definition of trade secret.

CDI contends that the Defendants acquired intimate details of its customers' oil and gas well programs and strategies, CDI's costs and pricing, and CDI's customized solutions to their customers' individual needs. See Affidavit of Danny Matherne, Docket No. 11-2, p. 3. Through its efforts, CDI has established specialized and proprietary methods and technical manuals which are not accessible to its competitors. Id. at 4. Further, CDI had taken steps to safeguard its customer and business information through both confidentiality and conflict of interest policies. Id. at 5, 11-15.

### 2.     MISAPPROPRIATION OF CDI'S TRADE SECRET INFORMATION

The UTSA defines "misappropriation" as follows:

a. Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
b. Disclosure or use of a trade secret of another without express or implied consent by a person who:
    (1) Used improper means to acquire knowledge of the trade secret;
    (2) At the time of disclosure or use, knew or had reason to know that
    the person's knowledge of the trade secret was:
        (a) Derived from or through a person who had utilized
        improper means to acquire it;
        (b) Acquired under circumstances giving rise to a
        duty to maintain its secrecy or limit its use; or
c) Derived from or through a person who owed a dy to the person seeking relief to maintain its secrecy or limit its use; or
    (3) Before a material change of the person's position, knew or had reason to
    know that it was a trade secret and that knowledge of it had been acquired by
    accident or mistake.

N.D.C.C. § 47-25.1-01(2).

CDI contends that the Defendants have misappropriated trade secret information belonging to CDI. CDI contends that instances of this misappropriation include the following:

1. The Defendants cleaned out their belongings and personal effects without permission prior to their resignation on October 16, 2007;

2. The Defendants turned in no information at the time of their departure despite having worked for CDI over 9 years in some instances;

3. Based on information from customers since the resignations of the Defendants, the Defendants solicited the business of every CDI customer formerly serviced by the departing Defendants and induced them to transfer their business to West River while still employed by CDI;

4. Defendants have succeeded in displacing CDI as their sales and service provider for virtually all of CDI's Dickinson customers. Moreover, virtually all of the customers' business had been moved to West River effective the date of the Defendants' resignations; and

5. The Defendants removed customers' spare pumps from CDI's premises without permission prior to their departure.

CDI contends that the Defendants have already and inevitably will continue to disclose and/or use trade secret and confidential information regarding pricing, service, repairs, and technical expertise when soliciting or servicing CDI customers on behalf of West River. CDI further contends that it is the Defendants' possession of that trade secret information and confidential data that allowed the Defendants to acquire CDI's customers in Dickinson, North Dakota. CDI asserts that former CDI customers representing over one million dollars in annual revenue have already moved their business to West River. See Affidavit of Danny Matherne, Docket No. 11-2, p. 8.[1]

---

[1] The Court would note that North Dakota law does not recognize as lawful any contract or agreement which is designed to impose a restraint on the exercise of one's lawful profession, trade, or business except for the limited circumstances outlined in Section 9-08-06 of the North Dakota Century Code. See Warner and Co. v. Solberg, 634 N.W.2d 65 (N.D. 2001); Pruco Securities Corp. v. Montgomery, F. Supp. 2d 862, 868-869 (D.N.D. 2003).

The Court finds that at this preliminary stage of the litigation, and based on the information on file with the Court, CDI has established a sufficient likelihood of success on the merits with regard to its claim of trade secret misappropriation. Accordingly, the Court finds that this factor weighs in favor of the issuance of a temporary restraining order.

### B.    IRREPARABLE HARM

CDI contends that it will suffer irreparable harm through the misappropriation of its trade secret information resulting in the loss of CDI's well-established goodwill. CDI argues that all of its customers have been lured from CDI to West River and, as a result, CDI will lose over one million dollars in annual revenue. CDI contends that the Defendants' actions are unlawful and are having a direct, demonstrable, and substantial impact on its ability to conduct business. As a result of the Defendants' actions, CDI contends that it is threatened with the total loss of its business in Dickinson and its customer goodwill.

To show irreparable harm the plaintiff must show that harm is not compensable by money damages. Glenwood Bridge, Inc. v. City of Minneapolis, 940 F.2d 367 (8th Cir. 1991). The Eighth Circuit has held that a threatened loss of goodwill is sufficient to constitute irreparable harm. Medicine Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc., 336 F.3d 801, 805 (8th Cir. 2003). Also, other courts have concluded that the loss of an ongoing business "cannot be fully compensated by subsequent monetary damages" and "is not measurable entirely in monetary terms." Semmes Motors Inc. v. Ford Motor Co., 429 F.2d 1197, 1205 (2d Cir. 1995). Courts have similarly found irreparable harm where a party is threatened with the loss of a business and customer goodwill. See Tom Doherty, Inc. v. Saban Enter., Inc., 60 F.3d 27, 37 (2d Cir. 1995); Ryko Mfg. Co. v. Eden

Servs., 759 F.2d 671, 673 (8th Cir. 1991) (finding irreparable harm shown and injunction warranted when distributor would be possibly forced out of business).

The Court finds that at this preliminary state of the litigation, CDI has established that it would likely suffer irreparable harm if a temporary restraining order is not issued. Therefore, this factor weighs in favor of the issuance of a temporary restraining order.

### C.   BALANCE OF HARM

CDI contends that the request for a temporary restraining order and preliminary injunction will not harm the Defendants, and that any possible harm to the Defendants will be minimal. CDI contends that, if an injunction is granted, the Defendants can continue to work in the oil and gas industry and can compete for customers through fair competition. The Court finds that the issuance of a temporary restraining order will maintain the status quo at this preliminary stage and will not create an undue hardship to either party. Thus, this factor weighs in favor of the issuance of a temporary restraining order.

### D.   PUBLIC INTEREST

The public interest favors the protection of trade secret information gathered and developed by a company at significant expense. La Calhene, Inc. v. Spolyar, 938 F. Supp. 523, 531 (W.D. Wis. 1996). Therefore, at this preliminary stage, this factor also weighs in favor of the issuance of a temporary restraining order.

### III.  CONCLUSION

After carefully reviewing the entire record, the Court finds that the Plaintiff has met its burden of establishing the necessity of a temporary restraining order.  The Court grants the Plaintiff's Motion for a Temporary Restraining Order (Docket No. 10) and will reserve ruling on the request for a preliminary injunction until after the show cause hearing.

Based on the foregoing findings and conclusions, it is **ORDERED**:

1. That the Defendants and any person or entities acting in concert with or on behalf of the Defendants, including any officer, agent, employee, or representative of defendant West River Pumps, Inc., shall be restrained and preliminarily enjoined during the pendency of this action, from using, disclosing, or transmitting <u>for any purpose</u> any confidential information, which Defendants Martinson, Roller, and Heinle obtained during their employment with CDI, including without limitation, any of the customer lists, customer data, pump repair/history logs, policies or procedures manuals, business strategies, pricing or proposals made or planned by CDI for such customers, solicitation or sales literature, purchase contracts, sales contracts, service contracts, and or any technical analysis or other data provided by CDI for use by the Defendants in servicing CDI's customers.

2. That the Defendants shall appear in Courtroom One of the U.S. District Court for the District of North Dakota on Tuesday, November 27, 2006, at 2:30 p.m. to show cause under Rule 65 of the Federal Rules of Civil Procedure

why they  should not be restrained and preliminarily enjoined during the pendency of this action.

3. That the Defendants may at any time file a motion to dissolve or modify this temporary restraining order in accordance with Rule 65 of the Federal Rules of Civil Procedure.  If such a motion is not filed within 10 days after service of this order, the temporary restraining order shall be deemed consented to based upon the grounds set forth above until further order of the Court pursuant to any subsequently filed motion to dissolve or modify.

4. Pending the hearing and a determination of the Order to Show Cause, the Defendants and all persons or entities acting in concert with Defendants shall return to the Plaintiff all original records or documents and any copies in whatever form, of the Plaintiff's confidential trade secret information.

5. No bond shall be required to be posted by Plaintiff before the Temporary Restraining Order is effective

6. The Plaintiff shall arrange for service of this order together with the Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction and supporting pleadings and affidavits and shall file proof of service with the Court.

Dated this 20th day of November, 2007.

*/s/  Daniel L. Hovland*
Daniel L. Hovland, Chief Judge
United States District Court